**Exhibit A**
**To the Declaration of Rachel F. Strom**

# UNITED STATES DISTRICT COURT
## For The Southern District Of New York

|  |  |
|---|---|
| COUNTERR GROUP, *and* J. K. IDEMA,<br>*Plaintiffs,*<br><br>**v.**<br><br>NEW YORK MAGAZINE;<br>NEWYORKMETRO.COM;<br>NEW YORK MAGAZINE HOLDINGS, LLC,<br>LAWRENCE C. BURSTEIN,<br>STACY SULLIVAN;<br>JOSEPH A. CAFASSO; EDWARD A. ARTIS;<br>TRACY PAUL WARRINGTON,<br>TOD ROBBERSON;<br>Both Individually and Severally,<br>and DOES 1 through 7, inclusive,<br>*Defendants.* | **COMPLAINT**<br><br>**(Jury Trial Demanded)**<br>**Injunctive Relief Requested**<br><br>**07 # CIV   9516**<br><br>**Assigned Judge** |



RECEIVED
OCT 2 4 2007
U.S.D.C. S.D.N.Y.
CASHIERS

**NOW COME**, Plaintiffs, and allege and say the following concerning Defendants, and each of them:

### JURISDICTION

1.  This is an action for copyright infringement, contributory copyright infringement, and vicarious liability for Copyright Infringement, arising under the Copyright Acts of 1909 and 1976, 17 U.S.C. §§ 101 et seq., and includes various state claims. This Court has subject matter jurisdiction over these federal question claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) & (b). This complaint also alleges violations of New York, and North Carolina law to include; Breach of Contract, Theft, Civil Conspiracy, Fraud, Conversion, Breach of Implied Contract, Breach of Confidence, Tortuous Interference with Economic Prospective, interference with contractual relations, interference with prospective economic advantage, negligent misrepresentation, unfair and deceptive trade practices, defamation, copyright infringement, and contributory copyright infringement, and includes a claim for declaratory

relief. This Court has jurisdiction over these state law claims pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367(a), and has further jurisdiction over the declaratory relief claim pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

## VENUE

2.    Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(a) because the copyright infringement, contributory copyright infringement, and many of the other wrongful acts that give rise to these claims occurred in this district, and because the majority of Defendants, reside or can be found here. In addition, Defendants regularly transact business here, the infringing photographs were distributed from here, and throughout the world, and the infringing publication has its principal place of business within this district. The New York Magazine Defendants have extensive commercial activities in this State and their principle place of business is in this district. Additionally, this Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 in that the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs, and are between citizens of different states, as well as citizens or subjects of a foreign state.

## CASE OVERVIEW

3.    This case is primarily about the theft of the most valuable commodity in the news and media businesses— images. This is about the theft of images which were the protected property of the Plaintiffs. Those protected images were stolen, and published with the full knowledge of their copyright infringement by the New York Magazine Defendants, and others. This case demonstrates how theft has become a way of doing business by the media. Steal now, pay later; if you get caught, if the plaintiff can afford a lawyer, and if your victim is still breathing or in business... then consider paying. This *modus operandi* by the industry not only deprives copyright owners of profits, but also deprives them of credits and future work and sales. In this case, Defendants went far beyond the mere copying and distribution of protected images. These Defendants accused other images belonging to Plaintiffs of being faked and fabricated, and engaged in a carefully planned and orchestrated conspiratorial enterprise designed to defame Plaintiffs, cause Idema to remain illegally imprisoned, sway public support by publishing a completely fictional narrative of events that would cause him to be abandoned by friends, attorneys, and relatives, and destroy him financially. That specific

purpose, Plaintiffs' financial destruction, was paramount in Defendants' conspiracy. It was consummated through the vicious and false article titled "Operation Desert Fraud." The front cover of the October 25, 2004 New York Magazine touted a bold and vicious headline:

> **Our Con Man in Kabul**
> How Keith Idema Faked Out CBS and
> Random House with His Fantasy War
> By Stacy Sullivan

4.      Between 2004 and the present day, Defendants have engaged in an ongoing pattern of disingenuous subterfuge, defamation, conspiracy, fraud, and copyright infringement. Defendants have intentionally and knowingly made, and caused to be republished by third parties around the world, statements which were patently false and/or misleading, and in bad faith, designed to interfere with Plaintiffs' prospective economic advantage. They have also distributed protected images which were the rightful property of Plaintiffs.

5.      Upon information and belief, each of the Defendants was empowered to act as the agent, servant, employee and/or co-conspirator of each of the other Defendants, and that the acts alleged herein to have been done by each defendant were authorized, approved and/or ratified and/or known by each of the other Defendants. To this end, they engaged in a conspiratorial enterprise, which spanned multiple countries, and over a dozen states. They illegally accessed files, intercepted private emails, stole documents, forged documents and evidence, fabricated events, broke into and entered cars and residences, and knowingly orchestrated the financial demise of Plaintiffs.

6.      The pinnacle of Defendants' conspiratorial enterprise was the October 25, 2004 article, headlined on page 35 of the New York Magazine as:

> **Operation Desert Fraud**
> How Keith Idema Marketed
> His Imaginary Afghan War

It was perhaps the most vicious and false article ever written related to America's War on Terror and the liberation of Afghanistan. Using pictures stolen from Plaintiffs as the source of its credibility, New York Magazine, Sullivan, and the other Defendants, were able to present a believable and "fact based" article literally destroying the Plaintiffs and causing permanent and

irreparable harm which cannot be overstated. The problem was that the entire article was based on fiction— it was, quite simply, fantasy from the mind of Sullivan and her sources.

## PARTIES

7.     Plaintiffs, Counter Terrorist Group US (hereafter "CTG" or Counterr Group) and Counterr Group are North Carolina companies engaged in the support of US counter-terrorist initiatives, located in Cumberland County, NC.

8.     Plaintiff J. K. Idema is United States citizen formerly employed by the Counter-Terrorist Group, residing in New York.

9.     Defendant **NEW YORK MAGAZINE, aka** Defendant **NEW YORK METRO.COM,** is a monthly magazine published by Defendant **NEW YORK MAGAZINE HOLDINGS, LLC.** and Defendant **LAWRENCE C. BURSTEIN,** (hereafter jointly referred to as the "New York Magazine Defendants").

10.     The New York Magazine Defendants are located at 444 Madison Avenue, New York, NY 10022.

11.     **STACY SULLIVAN** is alleged to be the author of the defamatory and infringing article printed in New York Magazine on October 25, 2004. She is believed to be a resident of New York.

12.     **JOSEPH A. CAFASSO,** is a source of the defamatory and infringing article printed in New York Magazine. He is a resident of Carteret, New Jersey.

13.     **EDWARD A. ARTIS,** is a source of the defamatory and infringing article printed in New York Magazine. He is believed to be a resident of the Philippines.

14.     **TRACY PAUL WARRINGTON,** is a source of the defamatory and infringing article printed in New York Magazine. He is believed to be a resident of Texas.

15.     **TOD ROBBERSON** is a co-conspirator and source of the defamatory and infringing article printed in New York Magazine who, among other wrongful acts, illegally entered a private room with fake identification and stole documents and photographs from the room. Robberson admitted to third parties that he was working with Sullivan on the story, and they had planned a future book based on the Leonardo DeCaprio film *Catch Me If You Can.* The New York Magazine article was to be the lynchpin of the sale of an Idema conman

book/film which would, or was, upon information and belief, be presented to Jerry Bruckheimer. Robberson is believed to be a resident of Dallas, Texas.

16.    **JOHN DOES 1-7,** are persons yet unknown whose identities are believed will be determined during the course of discovery. Plaintiffs do not know the true names and capacities of those Defendants sued herein as DOES 1 through 7, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when such are ascertained. Plaintiffs are informed and believe, and on that basis allege, that each of the Defendants sued herein as DOES 1 through 7, inclusive, is in some manner legally responsible for one or more of the wrongful acts set forth herein.

## BACKGROUND FACTS

17.    In the 1980's Idema and Counterr Group assisted the United Front Military Forces (hereinafter the "UFMF"), often referred to improperly as the "Northern Alliance" by the press, in their struggle against the Soviets. In 2001-2002, Idema was a military advisor to Commander Ahmad Shah Massoud's UFMF.

18.    Shortly after Massoud's assassination on September 9, 2001, and the subsequent September 11 attacks, Idema joined with the UFMF (*aka* Northern Alliance) in Northern Afghanistan and remained with their forces until June 2002, upon which time he returned to the United States. He continued working with the UFMF and the transitional Afghan MOD (Ministry of Defence) in an advisory capacity.

19.    On July 5, 2004, Karzai government forces captured Idema during his anti-terrorist operations on behalf of the United Front Military Forces and other official governmental agencies.

20.    Thereafter, Defendants committed the acts complained of herein.

## FACTS

21.    Stacy Sullivan, writing an article for the New York Magazine Defendants, contacted Idema's attorney several times between August 2004 and October 2004. When she spoke to his attorney she constantly talked about how she was appalled by human rights aspect of case, the violations of human rights by the Afghan courts, and the treatment that Idema and his team were receiving at the hands of the Taliban judges and prosecutors. Sullivan feigned sympathy and concern, all in an effort to conceal her true motive and her involvement in the already ongoing conspiratorial enterprise with the other Defendants.

22.    During the conversations with Idema's attorney Sullivan agreed that New York Magazine would not attempt to use or print or distribute any images which belonged to Plaintiffs unless they were licensed through Polaris Images in New York, and that any photographs used would be obtained from Plaintiffs' photo agency, Polaris Images in New York.

23.    Sullivan agreed that if any photographs (still images or frame grabs) taken from videos supplied by Idema's attorney were used or republished, they would also be licensed

through Polaris Images. This was a valid contract. The New York Magazine Defendants agreed to pay for the photographs prior to publishing and then engaged in the subsequent theft and conversion of Plaintiffs' photographs and videos and breached that contract.

24.    Sullivan agreed, on behalf of the New York Magazine Defendants, to properly license ALL photos belonging to Plaintiffs, which was a contract, and therefore the subsequent theft and/or conversion, of Plaintiffs' photographs was not only a copyright violation, but a breach of contract, and in the case of frame grabs and intercepted emails, a breach of implied contract, conversion, and invasion of privacy. Unlike a violation for copyright infringement, this breach was predicated on a violation of trust or confidence—a breach of confidentiality, related to but distinguishable from a trust relationship, because Sullivan's breach of confidence involved an additional element.

25.    Sullivan assurances to Plaintiffs, through their attorney, that New York Magazine would not use any of Idema's materials or images for any story unless licensed from Polaris, was an intentionally false statement, made to deceive, which did in fact deceive, and to which Plaintiffs relied on to their detriment.

26.    Further, in September 2004, when Sullivan received the *Task Force Saber Videotapes* from an attorney, Sullivan agreed that the video Plaintiffs supplied them would only be used for corroborating statements made in court or by Idema or to contradict false statements made by Sullivan's "sources." It was also agreed that the New York Magazine Defendants would NOT use any photos or video without Plaintiffs' written permission or a proper license from Polaris Images in New York. The New York Magazine Defendants have published and distributed those pictures third parties in further violation of contracts, breach of confidentiality agreements and in breach of confidence.

27.    Idema's attorney later met Mariah Blake who defended Sullivan and told him that the article Sullivan wrote was completely different from the article printed in NY Magazine, and said that it was a true and accurate report which was later re-written by the NY Magazine article to convey an elaborate con by Plaintiffs. Blake stated that her article would set the record straight and track Sullivan's original truthful article. However, Blake's statements were intentional lies on behalf of Sullivan, designed to deceive, which did in fact deceive.

28.    After the initial publication of the New York Magazine article, on December 7, 2004, Idema wrote to Lawrence Burstein, the publisher of the New York Magazine requesting that this conduct cease and that the photos and tapes be returned and proper licenses or licensing contracts for the infringing photographs be provided to Plaintiffs if he had them, and that a retraction be made of the false statements.

29.    Additionally the December 2004 letter from Idema to New York Magazine put Defendants on notice that litigation would be forthcoming and made a clear and plain demand that Defendants preserve all notes, conversations, tapes, and/or documents, including emails, and informed the New York Magazine Defendants that; "[d]ocuments, or evidence, or materials in the possession of Ms. Sullivan, or New York Magazine, and/or related persons or entities, is hereby asserted to be discoverable evidence."

30.    In spite of the fact that the letter stated, "…this letter is to inform you that these evidentiary materials must be preserved until such time as litigation is concluded, and are not subject to any document destruction procedure or policy your organization may have or may institute in the future until such time as you receive written notification from me that all related litigation has ceased, upon information and belief, the New York Magazine Defendants, and others, destroyed documents, evidence, and emails.  Upon information and belief, this spoliation included, but was not limited to, the destruction of emails and photographs from Joseph Cafasso, a source who has fraudulently misrepresented himself as, among other false identities, both a US Army Delta Force Colonel with numerous Silver Star awards for heroism, and a CIA agent who was working for the White House.  The New York Magazine Defendants knew, or should have known, that Cafasso was a fraud, because the NY Times had previously run a story exposing Cafasso (*The Colonel Who Wasn't* – Jim Rutenberg, April 29, 2002). Upon information and belief, the emails destroyed contained evidence of the fabrication of events, theft of images, illegal access to private email accounts, and conspiracy to infringe copyrights and violate property rights.

31.    This destruction of notes, conversations, tapes, and/or documents, including emails was in violation of law and intentionally meant to conceal evidence of wrongdoing by Defendants, and/or their agents, which constituted the spoliation of evidence and an obstruction of justice.

## SPECIFIC COPYRIGHTED IMAGES – WRONGFUL USE

32.    Some of the known wrongful uses of specific images by the New York Magazine Defendants are as follows:

32.1.    **Page #37- Wanted Poster photo.  The poster on page #37** is a copyright violation as it is Plaintiffs' photo of the poster.  This was a picture Idema took of a document which was not yet available to the public and which was published in violation of copyright law because Idema created the photo. This photo was also only for release under a very specific set of contractual terms.  When the New York Magazine Defendants were unable to license the photo through Polaris Images, they published the photo and ignored all rights and privileges which were intentional and knowing violations of law.  Upon information and belief, the New York Magazine Defendants, or their co-conspirators, attempted to use a photo editing program to remove certain identify marks and characteristics to conceal the source of the photo.

32.2.    **Page #37- Group Standing in Front of Helicopter.**  The Task Force Saber picture in front of the Northern Alliance MI-8 Helicopter on page #37 is a copyright violation as it Plaintiffs' photo.  This was a picture taken which was not yet available to the public and which was a violation of copyright law because Plaintiffs created the photo. This photo was also only for release under a very specific set of contractual terms.  When the New York Magazine Defendants were unable to license the photo through Polaris Images, they published the photo and ignored all rights and privileges which were intentional and knowing violations of law.

32.3.    **Page #37- EPW[1] Monk Photo During Interrogation.**  The New York Magazine Defendants have previously alleged that they received a copy of this photo from Polaris Images, however, this was false.  Polaris Images did not possess that photo during that time period.  The New York Magazine Defendants obtained the photo from a confidential email, and not only violated Plaintiffs' copyright by publishing it, but also, upon information and belief, intercepted private and confidential correspondence, thereby violating a right to privacy and electronic communication laws. The original version of the "page 37 EPW Monk Photograph" was being sold as

an exclusive picture in a licensed article in another magazine, and the New York Magazine Defendants' publication of this picture caused significant damages when that article was cancelled.

32.4.    **Page #37- Hunt For Bin Laden Book.**  The New York Magazine Defendants never attempted to license this photo or cover, both of which Plaintiffs hold the copyright to.

32.5.    **Page #37- The picture of Jack Idema and Dan Rather.**  Upon information and belief, the New York Magazine Defendants took this picture from a videotape supplied in confidence to Defendants without obtaining a license.  Although this picture is believed to be the copyright protected image of CBS News, the picture is restricted by contract from any other use other than the original program, and therefore damaged Plaintiffs in that it could not be licensed from CBS, nor was permission obtained from Plaintiffs.

33.    While the New York Magazine Defendants did license other photographs for the article from Polaris Images, they did not license these photos.  Further, on page 37 of the October 25th, 2004 New York Magazine issue, the New York Magazine Defendants intentionally left out photo credits for the Idema article.  This failure to credit photos was an intentional effort to conceal Defendants' copyright violations and the criminal liability derived from the interception of electronic communications (including their civil liability for violations of privacy).

### DEFENDANTS' INTENTIONAL AND NEGLIGENT VIOLATIONS OF THE COPYRIGHTS

34.    First, New York Magazine Defendants knew that Plaintiffs' photos were being licensed through Polaris Images in New York.

35.    Second, New York Magazine Defendants engaged in conversations about licensing images and videos from Polaris Images, and Defendants inquired into licensing those images prior to their wrongful use.  Therefore, the New York Magazine Defendants made a conscious and knowing decision to forgo proper licensing and simply steal the images.

36.    Third, Defendants intentionally and knowingly concealed the source of the photos by omitting photo credits and marks to conceal their theft.

---

[1] EPW- *Enemy Prisoner of War*

37.    Fourth, the New York Magazine Defendants intentionally cropped and altered still photographs to conceal their source and credits.

38.    Fifth, the New York Magazine Defendants knowingly published images that were being reserved for an exclusive story rights sale, thereby depriving Plaintiffs of substantial income, which could have been used for Idema's legal defense.

39.    Sixth the New York Magazine Defendants had a responsibility to properly license the images, to know copyright law, and to correctly report the facts and refrain from those intentional copyright violations which these Defendants and their co-conspirators engaged in.

### NEW YORK MAGAZINE'S INTENTIONALLY FALSE REPORTING

40.    The New York Magazine Defendants exercised property rights and ownership in violation of the agreements apparently relying on the hope that if Idema remained in an Afghan prison for twenty years he would be unable to engage in legal recourse against these Defendants.

41.    To this end, the New York Magazine Defendants intentionally misreported the facts of stories and used questionable sources which they knew, and/or should have known, were providing false information.

42.    The New York Magazine Defendants knowingly and negligently republished false statements with a reckless disregard for the truth and used Plaintiffs' stolen images to increase the distribution of those false statements and aid their fraud. The stolen images gave the impression that the New York Magazine Defendants had exclusive, special access, and insider knowledge of the story. By illegally using those images the New York Magazine Defendants were able to make their story appear as though it was credible and true.

43.    The purpose of this false reporting was to assert permanent dominion and control over a variety of images, and their false version of the Idema story, which the New York Magazine Defendants and their co-conspirators could profit from, intentionally raise the controversy surrounding the events and turn the story into a torrid tale of torture and crime which all of the Defendants could thereby profit from both financially and politically.

44.    In her article, Sullivan alleged, among other vicious and false statements, that Idema had hung innocent Afghan men upside down in a basement by their feet and tortured

them.  However, Associated Press reporters admitted to Idema that they had been to the Task Force Saber compound in Kabul and found no evidence of anyone ever hanging upside down, torture, or other crimes alleged.  Further, they freely admitted that there was no basement in the house and that the allegation of men hanging upside down in a basement was obviously false.

45.    What was particularly egregious in this instance, was that while the New York Magazine Defendants were selling their magazine and profiting from their distribution of Plaintiffs copyrighted images, at the same time Sullivan was intentionally omitting the exculpatory nature of the video from her story and continuing to propagate the vicious myth that Idema had been hanging Afghans upside down in a non-existent basement and torturing them.  This was remarkably similar to the conduct of journalists who falsely claimed American soldiers at GITMO, Cuba had flushed Korans down toilets.  In sum, it was a complete fabrication of facts and events born from the imagination of a questionable journalist who had knowingly joined in a conspiratorial enterprise for the purpose of destroying Plaintiffs.

46.    As an example, by reporting the horrifying story that "three prisoners found in Idema's custody during the raid were blindfolded and beaten and strapped to the ceiling by their feet; five others were tied to chairs with rope in a small, dark room down a hall that was littered with bloodied clothing," the New York Magazine Defendants insured a heavy readership for their story during a time when news reporting in Afghanistan was at an all time low.  During this time, Stacy Sullivan and her co-conspirators were able to use these false statements to undermine the US allied relationship with the United Front, lift their sagging careers and raise their international profile, thereby profiting from their intentionally false statements. At the same time, by disseminating what at least four Afghan high court and appeals court judges later called "propaganda" and "lies," Sullivan and her co-conspirators were able to wrongfully use Plaintiffs' images and documents without fear of reprisal believing that Idema would be imprisoned for many years, certainly longer than the statute allowed for filing of civil actions in U.S. courts.

47.    To this end, Sullivan, and others, both known and unknown, entered into a conspiratorial enterprise, the purpose of which was to create a story so shocking, and so vicious, that it would encircle the globe in one of the largest and far-reaching stories related to the War on Terror in 2004.  A story which, although completely false, helped alter foreign

policy and the Pentagon's strategic plan against terrorism in Afghanistan. The false accusations against Idema and his men were, upon information and belief, a carefully engineered propaganda campaign covertly orchestrated by an Associated Press reporter named Amir Shah on behalf of his terrorist co-conspirators to release those terrorists which plotted to, and later succeeded, in altering the political course of Afghanistan through assassinations, bombings, and murder. Shah's conspiracy with *al-Qaida* resulted in the deaths of hundreds, if not thousands, of innocent people through their bombing rampage. Sullivan used Shah's false statements without independently verifying the veracity of those statements, and without exercising due diligence to report events in a foreign country which were unprotected by any Fair Reporting Privilege.

48.    This conspiratorial enterprise is further addressed herein, and was responsible for thousands of false articles throughout the world, which continue to be republished to this day.

### INTENTIONAL WITHHOLDING OF EXCULPATORY EVIDENCE AND RECKLESS DISREGARD FOR THE TRUTH

49.    In April 2004, Idema's counter-terrorist team, known as Task Force Saber, and later TF Saber 7, was back in Afghanistan working closely with U.S. and Afghan military and intelligence activities.

50.    All of Idema's team members were officially employed by the Ministry of Defense or Afghan CIA, except one, who was an Emmy award-winning journalist who had worked for AP, ABC, NBC, and CNN, now working as an embedded journalist with Task Force Saber a story about the *al-Qaida* terrorists in Afghanistan, the Taliban infiltration of the new government, and the ineffectiveness of conventional military operations against the growing terrorist resistance and attacks.

51.    In June 2004, Idema and his team had captured the brother-in-law of bin Laden's chief of security and the terrorists responsible for the murder of Canadian ISAF Corporal Jamie Brendan Murphy. Corporal Murphy had been murdered in a bombing on Darlaman Road in Kabul on January 27, 2004.

52.    On July 5, 2004, Idema was arrested by anti-UFMF forces. It has since been learned that this was orchestrated by persons, both known and unknown to, among other things,

prevent the exposure of a plot to assassinate Hamid Karzai's primary political opponents who were former U.S. allies. Idema and his team were falsely accused by the press of "running a torture chamber," "torturing innocent Afghans," and other illegal conduct. Three other false claims allegedly made were that Idema had "innocent Afghans hanging from the ceiling in his basement," that the terrorists were being "abused, tortured, and starved," and that Idema and his men were simply "rounding up innocent Muslims with long beards" (only 3 of 11 had any beards at all). The New York Magazine Defendants republished these false statements in modified forms, as more particularly set forth hereafter.

53.    In spite of that, the New York Magazine Defendants had information disproving the false allegations they intentionally and knowingly withheld this information from their reporting. As an example, Sullivan saw pictures inside Idema's compound and, upon information and belief, interviewed eye witnesses, and was thus aware that there was NO basement and no evidence of anyone ever being hung upside down or any other way—so therefore, any claims that terrorists "were hanging from the ceiling in a basement" or "by their feet in a basement" or other similar statements repeated by the New York Magazine Defendants were made negligently and with reckless disregard of the truth. The New York Magazine Defendants also had video evidence directly refuting the charges that ANY terrorists were hanging from anything, or tortured, or beaten.

54.    Furthermore, the New York Magazine Defendants had or should have had either actual disbelief or serious doubts that any torture had been conducted. The New York Magazine Defendants had seen Idema's questioning techniques on video and the level of terrorist cooperation during the questioning and was aware there was no torture being conducted. The New York Magazine Defendants also had knowledge that these "innocent Afghans" were in fact terrorists. Prior to publishing the article, the New York Magazine Defendants had videotapes in their possession that confirmed, among other things, that: a) the detainees were terrorists, b) there was no torture, and c) Idema and his men were innocent of the false charges alleged.

55.    The New York Magazine Defendants withheld this exculpatory information and continued to falsely report the same story of mythical torture; rooms littered with non-existent bloody cloth, fabricated tales of boiling water, and ludicrous fictional accounts of a *Marquis de*

*Sade* torture chamber which other new agencies and internet sites then republished throughout the world and have continued to republish time and again throughout the last three years and even now.

56.    The New York Magazine Defendants published false, and in many cases completely fabricated fictional statements about Idema negligently and with a reckless disregard for the truth.  At the same time, the New York Magazine Defendants intentionally and knowingly withheld exculpatory evidence, which would have aided Idema and his men who had been falsely accused of horrific crimes.  Upon information and belief, the New York Magazine Defendants believed that the "torture version," regardless of how disingenuous it was, was in line with AP's and major networks Abu Ghraib reporting and therefore a better story for New York Magazine, and better chance for Sullivan, Robberson, and others, to sell a book or film based on this fictional fabricated story about Idema.

57.    The New York Magazine Defendants also published false, and in many cases completely fabricated fictional statements accusing the Counter Terrorist Group of criminal activity, and being charged with criminal activity, wrongfully seeking charitable donations in violation of law, mail fraud, faking (along with Idema) al Qaida terrorist training tapes, and other false conduct.

58.    The New York Magazine Defendants also published false, and in many cases completely fabricated fictional statements accusing Idema of criminal activity, mail fraud, faking both al Qaida training tapes and videotapes of conversations with Department of Defense officials, and creating an imaginary war, falsifying events in the NY Times best-selling book, *The Hunt For Bin Laden,* stealing books from Random House, and stealing money from bank accounts.

59.    Further, the withholding of information and knowingly false reporting by the New York Magazine Defendants caused other news agencies and magazines, such as the Columbia Journalism Review and hundreds of internet news sites, to continue to rely on false information and anonymous sources instead of facts and the New York Magazine Defendants intentionally concealed the identity of those sources, such as Joseph Cafasso, so they could not be refuted or disputed, and/or, in at least one case, so that they could not be proven to be fictitious and non-existent.

60.     One of New York Magazine's sources was Lutfallah Mashal, whom Carlotta Gall at the NY Times described as the most unreliable source in Afghanistan and who Gall stated had "repeatedly lied" to her.  Mashal's unreliability was widespread knowledge and Defendants not only knew Mashal was an unreliable source, but were in possession of actual evidence completely contradicting Mashal's statements.  Yet, the New York Magazine Defendants, negligently and with reckless disregard for the truth, falsely reported the story and published statements they knew were false, misleading, and defamatory.

61.     By falsely reporting the events in the case against Idema and his team, The New York Magazine Defendants, and their co-conspirator sources stood to profit immensely.  In essence, New York Magazine needed a hot salient and torrid story of abuse in Afghanistan to compete with CBS' scoop on the Abu Ghraib incidents—Sullivan, Robberson, and other co-conspirators needed a tale of con men and vicious behavior to sell their book and film.  To meet this need, like AP, the New York Magazine Defendants created their own exclusive torture story; the completely fabricated story of Jack Idema's non-existent torture chamber, in a non-existent basement and a charlatan in the image of the *Flim Flam Man* and DeCaprio in *Catch Me If You Can.*

62.     The New York Magazine Defendants "added value" to this story with an angle of a fraudster con man mercenary who had faked the *8mm VideoX al-Qaida Terrorist Training Tapes* for profit and prestige, created his own "imaginary war," and fabricated events in the Hunt for Bin Laden book about the 2001-2002 war in Afghanistan.

63.     These false claims by the New York Magazine Defendants, Edward Artis, Joseph Cafasso, Tracy Paul Warrington, and other co-conspirators, both known and unknown, have caused serious and devastating financial lost to Plaintiffs in lost revenues from the *Hunt From Bin Laden* book, other associated books, and the *8mm VideoX al-Qaida Terrorist Training Tapes.*

64.     The New York Magazine Defendants had a duty to disclose the exculpatory information they withheld and to include this information in their story about Plaintiffs.

65.     Defendants acted wrongfully and engaged in defamation, libel, slander, and libel *per se,* by negligently and recklessly republishing false statements by Mashal, Jalali, terrorists, fictitious non-existent sources, and others, which the New York Magazine Defendants knew

firsthand to be false, and in some cases, were the simply the fabrications of Amir Shah's vivid imagination.

## NEW YORK MAGAZINE'S SOURCES

66.    The New York Magazine Defendants' article was in most part based entirely on fiction. Fiction so damaging and so horrific, that it has been reprinted around the world time and again for three years in thousands of forums, web blogs, internet chat rooms, reports, and books. The description of innocent men, hanging upside down in a bloody basement, was perhaps the most shocking revelation of inhumanity in the War on Terror since its beginning. Who was responsible for this fiction that traveled the world? At the creative level, it was two AP reporters, one of which is linked to the Taliban in Afghanistan and who is vehemently anti-US and anti-liberty forces Islamic fundamentalist—Amir Shah. At the managing level, it was at a minimum AP Bureau Chiefs.

67.    This fiction was used as the foundation of Sullivan's *Operation Desert Fraud* article in New York Magazine—but Sullivan, and her co-conspirators, took it to another level with fiction so twisted and bizarre that it would shock the conscience of anyone who actually had the true facts.

68.    The Fair Report privilege does apply to an illegal Afghan Court, and certainly not statements made outside the official court proceedings. Here, the statements printed by Defendants, alleging extreme torture, beatings, immersion in boiling water—without so much a single mark on any terrorist as evidence of this extreme abuse, men hanging upside down from ceilings in a non-existent basement, and other unsupported nefarious conduct, were not contained in any official report. They were not made at any official press conference or during testimony. They were made by a) an American citizen, former Minister of Interior, b) his former spokesman— both acting outside their official duties, c) the Associated Press, d) her co-conspirators, e) an "anonymous source" – none of which were involved in the indictment, prosecution, or trial, f) a fictitious source fabricated by Shah, and, g) others not protected by an Fair Report privilege. In fact, the then Minister of Justice, Abdul Kareem Karimi, now Ambassador Karimi, discounted all of these statements within days, saying they were "simply not true." Defendants intentionally withheld this information.

69.    Defendants' statements imputed far more serious conduct than the actual charges reflected, and were not based on any official report, because there was no such report.

70.    It was eventually discovered that the New York Magazine Defendants used a real con man named Joseph Cafasso as their primary anonymous source for the article. Cafasso had been previously fired from FOX News for impersonating a Colonel in the US Army Special Forces' Delta Force. Cafasso falsely claimed to have three Silver Stars and been the hero that rescued a flight crew from a burning plane during the Iranian hostage rescue attempt in 1979. In reality, Cafasso had 44 days in the army, and was discharged as a private.[2]

71.    In 2004, Cafasso reinvented himself as Colonel Gerry Blackwood, a member of the White House staff who was CENTCOM's top intelligence commander in the Gulf War, a pilot and nuclear physicist who spoke six languages, and was a DIA and CIA agent who was on special assignment to the FBI. The entire "Blackwood" persona and background was of course, transparently phony. In July 2006, plaintiffs discovered that Cafasso, *aka* the new Colonel Blackwood, was speaking regularly at a university, and was on the Committee for Concerned Journalists. Cafasso, posing as CIA/DIA/FBI operative Colonel Blackwood, worked closely with Sullivan and Mariah Blake (the Columbia article writer who co-conspired with Sullivan) and others to orchestrate the fake and fabricated New York Magazine article.

72.    It was also discovered in July 2006, that Cafasso/Blackwood was the anonymous source running a blog site called "stuporpatriots" and using it to stalk and harass Bennett, Idema, their civil attorneys in California, New York, and North Carolina, and witnesses against Cafasso and his co-conspirators. Cafasso/Blackwood was also identified as the person posting defamatory and vicious information across the internet under of hundreds of alias names, false identities, and email pseudonyms. Women were being stalked and threatened with assault, called whores, lying whores, frauds, con-artists, psychotic and homicidal, and other extreme slurs, such as "poster-gal...for the justification of spousal abuse," by Cafasso/Blackwood, upon information and belief, with the help of his New York Magazine and other co-conspirators.

73.    Idema never misrepresented his military record and Defendants do not have, have never had, and never will have, any proof or evidence to the contrary (other than rumor and innuendo). In fact, it was New York Magazine and their co-conspirators that intentionally

and knowingly misrepresented Idema's military record, and used falsified documents fabricated by Joseph Cafasso (masquerading as "Colonel Blackwood"), and upon information and belief, Edward Artis, including an obviously fake military DD-214 form which was forged by Cafasso, and others, both known and unknown.

74.    As a bold faced header in the New York Magazine article, Sullivan stated;

**"But the Intelligence experts analyzed the CBS tapes and "determined they were staged," one source says.**

Further stating in the article:

"Another retired Special Forces soldier, and a longtime acquaintance of Keith Idema's, contacted CIA sources and learned the Agency had similar concerns about the tapes authenticity. "The CIA ran voice analysis on the tapes and concluded they were staged," he says, adding that the agency didn't publicize its findings because it "didn't want to waste its time on someone it considered harmless."

No <u>actual</u> expert believed the tapes were fabricated. New York Magazine's anonymous Special Forces and CIA source was the phony Colonel, Joseph Cafasso, *aka* Colonel Jerry Blackwood, both fake *personas*. Neither the real Cafasso, nor the fictional Blackwood, ever having actually served in the army, nor ever been employed by the CIA or in Special Forces, but that didn't stop Sullivan from using them as a source. The other "expert" was Tracy Paul Warrington, a man who had been out of the military for 15 years, had never been to Afghanistan, or engaged *al-Qaida*, or even seen a terrorist, except on television. In fact, just some of the actual experts to view the tapes included, Tom Sanderson Director of the Transnational Threat Initiative at the Center for Strategic & International studies, who said, "This looks like a *bona fide* training video – that's for sure;" and General Gary Harrell, a former member of the US Army Special Forces Operational Detachment Delta (Delta Force), and at the time commander of the Special Operations Task Force in Afghanistan, came to the opposite conclusion. New York Magazine had been supplied this videotape. Also appearing in that video, in various programs, such as NBC *Dateline*, where Plaintiffs' *8mm VideoX al-Qaida Terrorist Training Tapes* were aired, are FBI Supervisor Tom Maxwell, Chief of the

---

[2] NY Times Article, *The Colonel Who Wasn't*

New York Counter-Terrorism Bureau, "Terrorism Expert Bruce Hoffman," "*al-Qaida* Expert Simon Reeves," and "Washington Post CIA Reporter Dana Priest." None of which questioned the authenticity of the *8mm VideoX al-Qaida tapes.* New York Magazine purposefully ignored every legitimate expert on the planet. In other words, not a single KNOWN expert alleged the tapes were fake, but four people who were defendants in prior cases accused of fraud, among other things, none of which were experts, and all of which lied about their credentials, were given a soap box by New York Magazine, which then jointly conspired with these individuals to commit cyberstalking, defamation, interference with prospective economic advantage, and the other torts complained of herein.

75.     By impugning the integrity of the *8mm VideoX al-Qaida tapes* New York Magazine, and their co-conspirators achieved their ultimate goal, to impeach Plaintiffs'' credibility and destroy their financial income to assure that Idema was rendered destitute and remained in an Afghan prison.

### NEW YORK MAGAZINE'S FALSE AND/OR MISLEADING STATEMENTS

76.     Over the past three years, starting in or about July 2004, Defendants have wantonly, knowingly, and repeatedly, published intentionally false or misleading statements to the detriment of Plaintiffs, for which they are liable for that distribution in violation of Defendants' verbal and express contracts.

77.     Some of those most egregious statements in the article are as follows:

Paragraph #1 –

States "in January 2002…

    A. "…Keith – was more than a little dubious."
    B. "Idema claimed to be working as an advisor to the Northern Alliance."
    C. "…Ex-con…Federal Prison…and had a criminal record in three states."

Paragraph #3 –

    A. "Tracy-Paul Warrington… says the tapes are not an intimate look at anything – except clumsy military playacting."
    B. "Eight-five percent of terrorists attacks in the last decade have been bombings, "Warrington says." In this film we see raids. This was a method that went out in the seventies, when Idema was in the Army."

C. "I was looking at seven hours of tape of something that al-Qaida doesn't do."

D. "Another retired Special Forces soldier, and a longtime acquaintance of Keith Idema's, contacted CIA sources and learned the Agency had similar concerns about the tapes authenticity. "The CIA ran voice analysis on the tapes and concluded they were staged," he says, adding that the agency didn't publicize its findings because it "didn't want to waste its time on someone it considered harmless.""

Paragraph #4 –

A. "That could well change soon, as many things concerning the life and career of Keith Idema already have. Among other things, it is now clear that Idema was anything but harmless."

B. "When Afghan police arrested the trio on July 5, they said they saw a smaller-scale version of the gruesome prisoner-abuse photos from the Baghdad interrogation cells in Abu Ghraib."

C. "Early press reports indicated that three prisoners found in Idema's custody during the raid were blindfolded and beaten and strapped to the ceiling by their feet; five others were tied to chairs with rope in a small, dark room down a hall that was littered with bloodied clothing."

D. "All of the prisoners in Idema's custody were subsequently released; none was shown to be connected to Al Qaeda."

Paragraph #5 –

A. "CBS News received a video feed from this same Kabul house of horrors, featuring Idema in U.S. Army fatigues and brandishing an assault rifle…"

Header between ¶ 5 and 6 –

**"But the Intelligence experts analyzed the CBS tapes and "determined they were staged," one source says.**

Paragraph #6 –

A. "But the question remains: How does a freelance torturer claiming false military credentials turn up in American living rooms as an expert on the War on Terror?"

B. "The short answer is that, like other con men, Keith Idema made a very powerful impression."

C. "The anchor might also have added that Idema has made himself at home in all sorts of places: On military bases, at the head of a fictional company, in Lithuanian police training camps, in dealing with U.S. embassies, and – as Idema now alleges – with American military officialdom. And at every stop

along the way, Keith Idema increased his mastery of the fine art of press manipulation."

Paragraph #8 –

 A. "The Keith Idema story is a fable of fame, macho swagger, and opportunism in the age of Terror; fueled most of all by the craving for ever more vivid and dramatic kinds of media attention. It's the kind of tale that Joseph Conrad might concoct if he were reincarnated as a screen writer for '*Fear Factor*' or '*The Apprentice*.'"

Paragraph #9 –

 A. "Much about Idema's life and times is disputed. But this much is clear: well before he became a pariah, he was a military enthusiast and a media hound."

 B. "Recruits for Special Forces – a.k.a. the Green Berets – were thinning, and despite his diminutive height (five foot nine) and bad eyesight, the young man was accepted."

 C. But military records do not indicate that Idema was all that special a soldier. One particularly harsh evaluation, written by Captain John D. Carlson near the end of Idema's three-year tour, read: "[He] is without a doubt the most unmotivated, unprofessional, immature enlisted man that I have ever known."

Paragraph #10 –

 A. "post-enlistment career was none too distinguished either. He entered the Army Reserves, and then drifted around Poughkeepsie."

 B. "He'd displayed new equipment and technologies while circulating among the shows regulars: active Special Forces personnel, Defense Ministers, and Police Chiefs from abroad, together with mercenaries and Para-Military hangers-on of the '*Soldier of Fortune*' stripe."

Paragraph #11 –

 A. "In 1993, not long after his arrival, Idema claimed to have stumbled onto a Russian mafia plot to smuggle nuclear materials out of the country."

Paragraph #12 –

 A. "Unfortunately, he was losing his grip on his civilian life. Returning stateside to find his business in serious financial trouble, Idema devised an ingenious albeit illegal scheme to set up a dummy company to procure additional supplies that he never paid for."

Paragraph #13 –

    A. "A *Soldier of Fortune* convention, meanwhile, spurred the national news media to dig into Idema's original allegations about the Lithuanian nukes traffic."

    B. "Ted Kavavau, a retired TV-News executive who was one of the founding partners of *CNN*, spoke with some conventioneers about Idema.

Header between ¶ 15 and 16 –

      **"According to an aid director, Idema announced that his aim in the country was "to kill every Afghan I see."**

Paragraph #17 –

    A. "Idema was intending to work with *Knightsbridge International* and the *Partners International Foundation*, two aid groups run by former military personnel. (Each group now says that Idema misrepresented the reasons he was going to Afghanistan to gain their cooperation)."

Paragraph #19 –

    A. "Instead, says Long, Idema's behavior "Changed 180 degrees;" he set about tracking the movement of the *Northern Alliance* troops then fighting the Taliban and gave little input in discussions of medical care and food supplies."

    B. "According to Ed Artis, the former Army sergeant who heads *Knightsbridge*, Idema curtly announced on his arrival that he wanted "to kill every fucking Afghan I see."

Paragraph #20 –

    A. "Idema was more than simply obsessed with the Afghan war – he was, as other journalists on the scene have recounted, absurdly keen to capture dramatic war 'footage', even if it meant fudging the record of events."

    B. "Idema left the group, again hoping to find Northern Alliance troops to hang out with."

    C. "Scurka was hit with shrapnel in his right leg. As the group helped Scurka down the hill, and set about dressing his wound, Scurka's cameraman was capturing the scene on film. And this was when Idema returned, trailing clouds of camera-ready military glory: "Just when we finished [dressing Scurka's leg], Keith runs up screaming," Friend recalls. "He rips off the bandages and redresses the wounds. Basically, he was acting in front of the camera."

Paragraph #21 –

    A. "So Scurka finished still another documentary including no footage of Idema or his exploits.  The publicity hungry soldier on the make was suddenly adrift in a war zone without a cameraman.  But with his unusual brio, he reinvented himself again."

    B. He began calling himself Jack and telling journalists that he was working as an adviser to Northern Alliance troops; he also described himself as a Green Beret and claimed he was helping Special Forces round up Taliban and Al Qaeda suspects.

Paragraph #22 –

    A. "Before long, Idema was turning up regularly, via satellite telephone, on American television."

    B. "And sometimes he would claim, falsely, to be working for *Partners International*, which, like *Knightsbridge*, had severed all ties with Idema."

    C. "Mainly, though, he characterized himself in tellingly vague terms, even as he boasted about his high-octane military credentials: 'You must be held in high regard,' he told *Fox News* host Linda Vester via SAT phone in November 2001."

Paragraph #23 –

    A. "While Idema was thumping his chest in this fashion, officials from *Knightsbridge* and *Partners International* tried to warn American authorities that they had a rogue operator on their hands."

Paragraph #24 –

    A. "But Jack Idema, in his new incarnation as quote-ready ground warrior, was about to hit the media jackpot, in a moment of serendipity that would seem utterly implausible in a work of fiction.  Robin Moore, the bard of the Green Berets, arrived in Afghanistan in December, and Idema wasted little time in tracking him down and nominating himself as a source for Moore's new book, to be titled '*The Hunt for Bin Laden*.'"

    B. "… – moving slowly across Afghan war zones with the aid of a cane – was shadowing a group of Special Forces called A-Team tiger 02, …"

Paragraph #25 –

    A. "Moore and Idema didn't spend much time in the field together – it behooved Idema to keep a low profile among active Special Forces, for obvious reasons."

    B. "He boasted to war correspondents about the many al-Qaida suspects he had apprehended, and embroidered his banter with tales of Special Forces daring in Central America."

    C. "One heated argument over war coverage at a party ended with Idema's firing a pistol at Dallas Morning News' correspondent Tod Robberson and barely missing his left arm."

    D. "...when he produced the Al Qaeda training videos, all appeared to be forgiven: under representation from the photo agency Polaris, Idema sold the footage to '60 Minutes II' for a undisclosed fee..."

Paragraph #28 –

    A. "One thing is certain: regardless of who claims ultimate authorship of the book, *The Hunt for Bin Laden* teems with characterization of Idema as a titanic military presence in the Afghan war."

    B. "It asserts outright that Idema was the only Green Beret gathering intelligence on the ground. And Idema routinely storms to the center of the book's action to perform heroic feats of bravery."

Paragraph #30 –

    A. "Moore and Thompson, meanwhile, maintain that Idema overtook the narrative because *Random House* wanted it that way. The publisher 'wanted an action hero in the book,' Thompson says ..."

    B. Moore says that it was also Random House's decision to put Idema on the book's cover.

Paragraph #31 –

    A. "The next promotional twist concerning 'The Hunt for Bin Laden' was either poetic or perverse, depending on one's view of the publishing world."

    B. "Having at the very least finagled a portrait of himself as the prime mover in the Special Forces' Afghan war, Idema now was tapped to stand in for the Parkinson's-weakened Moore in bookstore readings and media appearances for the title."

Paragraph #32 –

    A. "Moore's book—the first allegedly insider account of the Afghan war—rocketed up the best-seller lists. But early reviews were harsh, and some called the book's reliability into question."

    B. "Moore was troubled by the claims and asked some Special Forces officers to review it for corrections in later editions."

Paragraph #33 –

    A. "When Idema got wind of Moore's efforts to change the text, he retaliated in what was becoming a reflexive fashion: He … declared that a shadowy group of Special Forces soldiers, jealous of the attention lavished on Idema, 'allegedly threatened and coerced 77-year-old Robin Moore"

Paragraph #34 –

    A. "Moore and Thompson say they soon learned that they were victims of financial chicanery as well as what appeared to be an enormous media scam."

Paragraph #35 –

    A. "In a deposition, Thompson said that Idema destroyed the interior of his own house with a samurai sword, that he choked his girlfriend in a fight, and that he forged a letter to on Fox News stationery for use as evidence in his lawsuit against the network."
    B. "A subpoena from the U.S. Attorney's office also arrived, followed by a letter from North Carolina's postal inspector, charging Idema with mail fraud for using a post-office box registered to the company to solicit funds for the US Counter-Terrorist Group."
    C. "… $18,000 from the company had gone missing…"
    D. "… Idema followed [Thompson to the bank] and threatened to kill both him and his girlfriend."

Paragraph #36 –

    A. "Moore, meanwhile, learned that Idema had ordered hundreds of copies of '*The Hunt for Bin Laden*' from Moore's account with *Random House* and never paid for them."

Paragraph #38 –

    A. "He set up shop in a rented house in Kabul, telling the landlord he intended to start a rug-exporting business. Instead, he founded a paramilitary outfit called Task Force Saber 7, complete with its own fatigues and military insignia… They hired four Afghans, and began rounding up Afghan civilians to interrogate about ties to Al Qaeda."

Paragraph #39 – (pg. 131)

    A.  "Idema's new Afghan campaign was all the more brazen, since Knightsbridge and Partners International had greatly stepped up their efforts to alert American authorities –"

Paragraph #40 –

    A.  "Finally Afghan police forces surrounded Idema's house on July 5, when, they claim, they discovered the infamous chamber of civilian abuse within."

Paragraph #42–

    A.  "The tape could, of course, have been faked – Idema's other exploits certainly cannot rule out such an explanation."

Paragraph #45–

    A.  "Long before he arrived on the scene in Afghanistan, Idema was in destructive thrall to the notions of solitary, Rambo–style heroism."

    B.  It seems clear as well that as Idema plied his peculiar brand of combat make-believe before more and more media outlets, the stakes became incalculably higher. Even when he began to realize his cross-media strategy of self-promotion was unraveling as *The Hunt for Bin Laden* came in for serious critical scrutiny, Idema did not run for cover, as more sensible con men might. Instead, he replenished his morale with another tour of far more dubious duty on the Afghan fronts. There's a certain tragic symmetry in Idema's goading himself into ever greater and more reckless acts of self-dramatizing valor; in that sense, Idema was very much his own worst enemy.

78.    Further, that these vicious and false accusations of horrific conduct by the New York Magazine Defendants, conduct which was completely fabricated and fictional, have been, and are still being, republished in thousands of articles, internet sites, and web blogs throughout the world. And, that these statements also constituted Tortious Interference With Prospective Economic Advantage, Tortious Interference With Contractual Relations, Negligent Misrepresentation, Unfair And Deceptive Trade Practices, and other causes of action.

## CAUSES OF ACTION

**1ST** CLAIM FOR RELIEF – Breach of Contract                                          29

**2ND** CLAIM FOR RELIEF –
        Tortious Interference With Prospective Economic Advantage            29

**3RD** CLAIM FOR RELIEF –
        Tortious Interference With Contractual Relations                           30

**4TH** CLAIM FOR RELIEF – Civil Conspiracy                                        31

**5TH** CLAIM FOR RELIEF – Fraud                                                   31

**6TH** CLAIM FOR RELIEF – Unfair And Deceptive Trade Practices          32

**7TH** CLAIM FOR RELIEF – Defamation                                              33

**8TH** CLAIM FOR RELIEF – Breach of Confidence                               34

**9TH** CLAIM FOR RELIEF – Conversion                                              35

**10TH** CLAIM FOR RELIEF – Negligent Misrepresentation                     35

**11TH** CLAIM FOR RELIEF – Copyright Infringement                          36

**12TH** CLAIM FOR RELIEF – Contributory Copyright Infringement         36

## FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT
### (Against The New York Magazine Defendants)

79.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

80.    Plaintiffs and the New York Magazine Defendants had a series of valid contracts and implied contracts.  The New York Magazine Defendants repeatedly and wantonly breached the terms of those contracts as set forth herein.

81.    These breaches of contract were material breaches that substantially defeated the purpose of the agreements and in some cases were both a violation of contract and/or a failure to perform.

82.    The New York Magazine Defendants' actions constitute a breach of the agreements and contracts between Plaintiffs and Defendants under the laws of North Carolina, and Afghanistan.

83.    As a direct and proximate result of this breach of contract, Plaintiffs have suffered, and will suffer, damages.  Plaintiffs' damages exceed $10,000, exclusive of costs and interest.

## SECOND CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against All Defendants)

84.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

85.    Plaintiffs had economic relationships with each of the major US news networks, and numerous foreign news networks, all of which were ongoing and had resulted in past economic benefits to Plaintiffs in support of their anti-terrorism efforts, and were fully expected to result in future economic benefits to Plaintiffs.

86.    Defendants had knowledge of most if not all of these business and economic relationships between Plaintiffs and third parties.

87.    The intentional acts of Defendants, as set forth throughout this complaint, such as the false statements related to innocent men hanging upside down, and other false

accusations of outrageous conduct, including claims that Plaintiffs committed mail fraud and related crimes, faked and fabricated videotapes, created an imaginary war, and fabricated events in *The Hunt For Bin Laden* book, were intentional acts by Defendants designed to disrupt the relationships between Plaintiffs and third parties and which did in fact disrupt these relationships, causing economic harm to Plaintiffs.

88.    Furthermore, by withholding knowledge of exculpatory evidence, falsely reporting the facts of Idema's Afghan criminal case, making false and unsupported statements, repeatedly misquoting pro-Idema sources, and distorting those events, negligently and with reckless disregard for the truth, Defendants induced third parties, including other news agencies to refrain from entering into licensing contracts with Plaintiffs. Plaintiffs' licensing of their *8mm VideoX al-Qaida Terrorist Training Tapes* to U.S. news networks has virtually ceased because of these false allegations against Idema. Further, Plaintiffs have lost valuable royalties from their copyrights and intellectual property as the result of Defendants' wrongful actions more fully set forth herein.

89.    Defendants' actions constitute a tortious interference with the economic advantage of Plaintiffs under the laws of North Carolina and an interference with economic gain under the laws of Afghanistan.

90.    As a direct and proximate result of this wrongful interference, Plaintiffs have suffered, and will suffer, damages. Plaintiffs' damages exceed $10,000 exclusive of costs and interest.

### THIRD CLAIM FOR RELIEF
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against All Defendants)

91.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

92.    Plaintiffs had legally binding contracts with major news networks and publishing houses. Defendants' false reporting of events caused networks and publishers to violate their contracts. Defendants' actions constitute a tortious interference with contract under the laws of North Carolina, and disruption of contract under the laws of Afghanistan in that Defendants' false statements and fabricated events caused others to violate their contracts with Plaintiffs.

93.    As a direct and proximate result of this wrongful interference with contract, Plaintiffs have suffered, and continue to suffer, damages.  Plaintiffs' damages exceed $10,000 exclusive of costs and interest.

## FOURTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (Against All Defendants)

94.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

95.    Defendants and their agents and employees, and each of them, entered into a conspiracy to engage in the wrongful conduct complained of herein, and intended to benefit both individually and jointly from their conspiratorial enterprise.  Defendants and their employees were jointly aware of the others acts, and the acts of their agents in furtherance of the conspiracy, and benefited therefrom.

96.    The purpose of the conspiracy was to intentionally violate the contracts between Defendants and Plaintiffs and exercise dominion and control over property to which Defendants had no rights and deprive Plaintiffs of income derived from their *Task Force Saber Videotapes*, the *8mm VideoX al-Qaida Terrorist Training Tapes*, and *The Hunt For Bin Laden* book, thereby injuring Plaintiffs for Defendants' own profit and gain.

97.    Further, to intentionally report the news falsely, and withhold exculpatory information for the purpose of concealing evidence and facts related to Idema's innocence, thereby damaging Plaintiffs.

98.    As a direct and proximate result of Defendants' conspiracy and fraudulent misrepresentations, Plaintiffs have suffered damages in excess of $10,000 exclusive of cost and interests, plus punitive damages, under the laws of North Carolina.

## FIFTH CLAIM FOR RELIEF
### FRAUD
### (Against All Defendants)

99.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

100.    Defendants, and their agents, repeatedly made false statements and assurances and Plaintiffs relied on those statements and assurances to their detriment and loss.

101.    On numerous occasions Sullivan made intentionally false statements intended to deceive Plaintiffs.

102.    Sullivan knew or should have known that the statements they had relayed to Plaintiffs were false. Sullivan made these statements intending for the Plaintiffs to rely upon them. Plaintiffs reasonably relied upon these statements.

103.    Sullivan's' false representations and/or concealment of material facts, were reasonably calculated to deceive, were made with the intent to deceive, and did in fact deceive, which resulted in damage to Plaintiffs.

104.    As a direct and proximate result of Sullivan's' fraudulent misrepresentations Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, under the laws of North Carolina.

## SIXTH CLAIM FOR RELIEF
### UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Against All Defendants)

105.    Plaintiffs incorporate by reference each and every paragraph contained in this herein Complaint.

106.    Defendants were at all times relevant to this matter, acting in and affecting commerce. The New York Magazine Defendants operate media businesses, and have used those businesses and their misrepresentations to wrongfully usurp and deprive Plaintiffs of their *Task Force Saber Videotapes* and the *8mm VideoX al-Qaida Terrorist Training Tapes*, thereby benefiting third parties, for wrongful purposes.

107.    Defendants' continued misrepresentations were unethical and/or unscrupulous and were deceptive not only because they had the tendency to deceive, but did in fact deceive. As a direct result of their actions, Defendants have damaged Plaintiffs, and are liable to Plaintiffs for those damages. These unfair and deceptive trade practices caused extensive harm to Plaintiffs by subverting and interfering with Plaintiffs' sale and licensing of their *8mm VideoX al-Qaida Terrorist Training Tapes to* broadcast agencies around the world.

108.    Defendants' actions constitute unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes.

109.    As a direct and proximate result of Defendants' unfair and deceptive trade practices Plaintiffs have suffered damages far in excess of $10,000 exclusive of costs and interest, and treble and/or punitive damages are especially warranted.

## SEVENTH CLAIM FOR RELIEF
### DEFAMATION
### (Against All Defendants)

110.    Plaintiffs repeat and incorporate by reference, as if fully set forth, the allegations herein.

111.    Defendants intentionally misreported the facts of Idema's arrest in July 2004 and thereafter by repeatedly making and republishing false statements.

112.    In their article which was re-published on internet sites around the world, Defendants (1) made false, defamatory statements about Idema; (2) repeatedly published those statements to third persons; and (3) caused injury to Plaintiff's reputation through those statements.

113.    Defendants committed libel *per se*, by continually making numerous and repeated false statements, which Defendants knew were false. These statements accused Idema of committing infamous crimes and impeached him in his trade and profession; and subjected him to ridicule, contempt and/or disgrace, and continued false imprisonment.

114.    Defendants falsely reported that Idema, Captain Brent Bennett, and Lieutenant Zorro Rasuli Banderas had abused eight prisoners and that Idema had the prisoners "hanging… by their feet." Originally it was thought that AP attributed this to "anonymous" Afghan official sources to conceal the identities of Jalali and Mashal. Even if that were fact, AP knew these sources were of questionable reliability and that this was untrue because AP had spoken to sources that had been in the Task Force Saber compound throughout that week and seen the conditions and treatment of the prisoners. However, it was just recently learned that AP's anonymous source for the accusation of hanging prisoners upside down may not have even existed, and it is alleged that it may have been simply a figment of Amir Shah's vivid imagination. In March 2007, Shah confided in an Afghan that his description of torture victims

hanging upside down was based on a scene in an Indian Bollywood film that had been released in Afghanistan just prior to his articles. Shah also said that he thought Americans could identify with this because he had seen evidence of Americans hanging prisoners from the ceiling in another film—The Punisher, which had come out just weeks before. Unfortunately, Shah's beliefs were based upon Hollywood fiction derived from the adaptation of a comic book. It would be difficult to believe that the other individual Defendants did not have knowledge of this fabrication.

115.    In spite of Defendants' knowledge that the statements were false, the New York Magazine Defendants printed and published statements, and caused statements to be reprinted and republished around the world.

116.    The New York Magazine Defendants used their story to impeach Idema's *8mm VideoX Terrorist Training Tapes* which show al-Qaida terrorists training at a terrorist training center in Mir Bacha Kot Afghanistan. By writing these stories, Defendants impugned the credibility and authenticity of the *8mm VideoX Terrorist Training Tapes,* thereby subjecting them and Idema to doubt as to their credibility.

117.    The New York Magazine Defendants' statements were made negligently and with a reckless disregard for the truth. Further, Defendants acted knowingly and intentionally, with constitutional malice, continuing their false statements, which were repeated time and again by other news agencies when in fact New York Magazine had a legal and ethical obligation to present a true and accurate report to the public.

118.    As a direct and proximate result of these false statements above, made negligently and with reckless disregard for the truth, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages and presumed damages, under the laws of North Carolina.

## EIGHTH CLAIM FOR RELIEF
### BREACH OF CONFIDENCE
### (Against All Defendants)

119.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

120.    As a direct and proximate result of Defendants' violations of the confidentiality agreements and breaches of confidence, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages.

## NINTH CLAIM FOR RELIEF
### CONVERSION
### (Against The New York Magazine Defendants)

121.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

122.    Defendants used Plaintiffs' proprietary images and distributed these images to third parties for their own profit and benefit. Defendants engaged in conversion because Defendants failed to return the *Task Force Saber Videotape* to Plaintiffs' attorney in violation of the agreement, thereby depriving Plaintiffs of the property.

123.    As a direct and proximate result of the Defendants conversion of Plaintiffs original proprietary materials, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, including special damages.

## TENTH CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

124.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

125.    The bulk of the statements made by Defendants constituted fraud, other statements, and those falling outside intentional fraud and/or constructive fraud, were negligent misrepresentations.

126.    Those statements, which may not have been intentional, were made by Defendants in the course of their business and profession.  Defendants failed to exercise the care and competence in communicating that information that Plaintiffs justifiably expected.

127.    The duty owed by Defendants was a greater scope of duty in that they had a public duty to provide accurate and truthful information.

128.    As a direct and proximate result of Defendants misrepresentations Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus punitive damages, against each of the Defendants, both jointly and severally.

## ELEVENTH CLAIM FOR RELIEF
### COPYRIGHT INFRINGEMENT
**(Against The New York Magazine Defendants - 17 U.S.C. Sections §§ et seq.)**

129.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

130.    Defendants, as set forth herein, have directly violated the copyrights of Plaintiffs and engaged in the copyright infringement of Plaintiffs' images by other third parties by distributing those materials to their clients.

131.    As a direct and proximate result of Defendants copyright infringement and/or contributory copyright infringement, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus statutory damages, against each of the Defendants, both jointly and severally.

## TWELFTH CLAIM FOR RELIEF
### CONTRIBUTORY COPYRIGHT INFRINGEMENT
**(Against All Defendants - 17 U.S.C. Sections §§ et seq.)**

132.    Plaintiffs incorporate by reference each and every paragraph contained in the herein Complaint.

133.    Defendants, as set forth herein, have directly violated the copyrights of Plaintiffs and contributed to the copyright infringement of Plaintiffs' images by other third parties by distributing those materials to their clients.

134.    As a direct and proximate result of Defendants copyright infringement and/or contributory copyright infringement, Plaintiffs have suffered damages in excess of $10,000 exclusive of costs and interest, plus statutory damages, against each of the Defendants, both jointly and severally.

### PRAYER FOR RELIEF

**WHEREFORE,** Counter Terrorist Group and Idema pray that this Honorable Court enter judgment in their favor and against Defendants as follows:

1. Awarding Plaintiffs damages in excess of $10,000 against Defendants pursuant to each of the claims for relief.

2. Awarding Plaintiffs punitive damages pursuant to the fifth and sixth claims for relief.

3. Awarding Plaintiffs treble damages, and attorneys' fees against Defendants pursuant to the sixth claim for relief.

4. Awarding Plaintiffs special and presumed damages, corrective advertising, and attorneys' fees against Defendants pursuant to the seventh claim for relief.

5. Entering a Temporary Restraining Order pursuant to the seventh claim for relief as set forth below until such time as a preliminary injunction can be heard and placed in effect until this case is concluded;

(a) adjudge and declare, that the New York Magazine Defendants have contributorily and vicariously infringed Plaintiffs' exclusive rights under the contracts and agreements, and Plaintiffs' rights under North Carolina law;

(b) preliminarily and permanently enjoin, pursuant to Rule 65 (b) of the N.C. Rules of Civil Procedure, the New York Magazine Defendants, their officers, agents, employees and those persons in active concert or participation with them, from directly, contributorily and/or vicariously violating Plaintiffs' rights under the agreements, including but not limited to, any use, exhibition, display or broadcast of Plaintiffs' images or from licensing or allowing any other person to do the same;

(c) preliminarily and permanently enjoin the New York Magazine Defendants from possessing any copies of Plaintiffs' images;

(d) preliminarily and permanently enjoin, pursuant to Chapter 75 of the North Carolina General Statutes, the New York Magazine Defendants, their officers, agents, servants, employees and those persons in active concert or participation with them, from engaging in one or more unfair and/or unlawful business acts or practices, including but not limited to, their possession, use, and/or display of Plaintiffs' pictures or video;

(e) require the New York Magazine Defendants and their officers, agents, servants, employees and those persons in active concert to cease any activity that encourages others to violate Plaintiffs' exclusive property rights in their images, or that encourages or permits viewers or other news organizations to transmit or possess copies of Plaintiffs' images to other persons;

(f) require the New York Magazine Defendants to engage in corrective advertising specifying the source, ownership, and authenticity of the *8mm VideoX al-Qaida Training Tapes and the Task Force Saber Videotapes*, and events related to Idema's case, and

6. Awarding Plaintiffs costs and interest against the New York Magazine Defendants and

7. Granting a trial for all issues that are triable.

Respectfully submitted, this 24th day of October 2007,

J. K. Idema, *Plaintiff*
12 Jonathan Lane
Poughkeepsie, NY 12603
Phone:  910/338-0107
Fax:      480/246-5626
Email: jack@counterterroristgroup.us

For Counter Terrorist Group US, *Plaintiff*
PO Box 691, Fayetteville, NC 28302
Phone:  910/483-5506
Fax:      910/483-5507
Email: Bumback@counterterroristgroup.us

____/s/_____
Vijayant Pawar (VP-7642)
Lead Counsel for *Counter Terrorist Group US*
Law Offices of VIJAYANT PAWAR
35 Airport Road, Suite 330
Morristown, New Jersey 07960
Phone: (973) 267-4800
Fax:     (973) 215-2882
www.pawarlaw.com
Email: vpawar@pawarlaw.com

John Edwards Tiffany,
Attorney (JT-7322)
*Counsel For Counter Terrorist Group US*
Law Offices of John E. Tiffany P.C.
The Robert Treat Center
50 Park Place, 10th Floor,
Newark, New Jersey 07102
Tel: (973) 242-3700
Fax: (973) 242-3799
www.JohnTiffanyLaw.com
Email: Jet@Jet4Law.com